Samuel C. Lewis, Appellant, *v.* The Springfield Water Company.

*Expert witnesses—Competency thereof.*

A witness who had been in the manufacturing business and knew the property in question, had experience in examination of manufacturing plants to determine their values, a general knowledge of the value of land in the vicinity, and who thought himself competent to testify as to the value of water powers, is qualified to testify, although he knew of no sales of such properties in the neighborhood for many years.

A real estate agent acquainted with the values of property in the vicinity, who had made an examination of the property in question, and who based his value on the general condition of things, although he knew of the sale of but a single property within ten years, is a competent witness as to the value of the property.

A manufacturer of experience who knew the rental value of water power although he had known of but a single sale is competent.

An experienced real estate agent who had examined mill properties on the creek in question, and was acquainted with their valuation about as any real estate man would be, and had had mill properties for sale, is competent to testify.

*Charge of court—Unnecessary remarks.*

The Supreme Court will not reverse for statements or explanations in the charge of the court that were not necessary, and which it might have been in better form to omit, but which did not seem to have misled the jury, or to have been injurious to the plaintiff's case.

Argued Feb. 19, 1896. Appeal, No. 189, Jan. T., 1896, by plaintiff, from judgment of C. P. Delaware Co., June T., 1893, No. 156, on verdict for plaintiff. Before STERRETT, C. J., GREEN, WILLIAMS, DEAN and FELL, JJ. Affirmed.

Appeal from award of jury of view assessing damages for taking of water under right of eminent domain. Before CLAYTON P. J.

On the trial Chas. I. Leiper, a witness called by defendant, testified that he had been in the manufacturing business for about

four years, until 1876, operating a mill near by. He further testified: Q. What experience have you had in the valuation of manufacturing sites? A. I have not had much experience in manufacturing plants. I have made examinations of them. Q. On what occasion? A. In Philadelphia. Q. For what purpose? A. To find out what the properties would bring at a sale.

The Court:

Q. Real estate or machinery? A. Both buildings and machinery.

Mr. Broomall, for defendant:

Q. You have examined this property of Mr. Lewis for the purpose of determining the question of how much it is diminished by the taking of this water? A. Yes, sir. Q. I offer this witness to show what the property is worth.

Mr. Smith, for plaintiff: I do not think he has qualified himself yet.

Mr. Broomall:

Q. When you lived at Avondale you lived on your own property? A. I lived on the property. I did not own the mill property: I owned my house and rented the mill. Q. And rented the mill property from your brother? A. Yes, sir.

The Court:

Q. Have you any particular knowledge of what the mills are held at and what they are sometimes sold for. A. I could not tell you of the Avondale property.

The Court: I don't think he is competent to give the figures before and after.

Mr. Bromall: I think the witness can say what they sometimes bring.

The Court: If he can say that I think he can testify.

Mr. Broomall:

Q. Have you a general knowledge of the value of properties, in this vicinity of Mr. Lewis, as to what is a fair market value, without stating the figures? A. Yes, sir; I think I have. Q. And you say you lived in that neighborhood a good many years? I do not mean the exact figures; do you know the price that properties have been sold for? A. No, sir. Q. Did you ever know? A. I don't think I did. Q. Have you a knowledge of what land, sixteen acres of land, what the fair market value

of land is? A. Yes, sir; I think I do. Q. Have you examined these properties? A. Yes, sir. Q. Do you think you are competent to testify as to the value of water powers? A. Yes, sir.

Mr. Smith:

Q. Mr. Leiper, upon what sales do you base your knowledge? A. The Avondale property. Q. When was that? A. About 1876 or 1877. Q. Upon what other properties? A. My own farm, adjoining it. Q. What else in this neighborhood? A. I can't tell you. Q. Do you not know the figures that they were sold for? A. No, sir; I do not.

The Court:

Q. Do you know of any other mill properties? A. No, sir. Q. Then why do you think that you are competent to testify to this property? A. Well, I don't know. Q. You have used water power; you have rented water power on this creek? A. Yes, sir; for four years. Q. Has there been any change in the water power of the creek since that time? A. I think not. I don't see any difference. I know what it costs to run water power in Philadelphia.

Mr. Smith:

Q. Did you ever build a mill? A. No, sir; not from the bottom up.

The Court: Well, let him testify.

Exception and bill sealed for plaintiff.

Mr. Broomall:

Q. Mr. Leiper, what is your judgment of the value of this property, say May, 1893, unaffected by the diminishment of the water power of Crum creek?

The Court:

Q. That is before the Springfield Water Company took the water, and not knowing that they ever would take it, what, in your judgment, was that property worth? A. From $11,000 to $12,000, I should say.

Mr. Broomall:

Q. Now, with the diminishment of two millions every twenty-four hours distributed in equal parts, which makes, according to the evidence, about three horse power a day, three and one sixteenth horse power; what, in your judgment, was the value of that property since? A. The question is, as I understand

you, what is the property worth affected by the taking of two million gallons?

Mr. Smith:

Q. The whole property, the depreciation of the whole property, the whole $12,000 worth? A. I should say from $1,100 to $1,200 less for the whole property.

The Court:

Q. About ten per cent? A. Yes, sir. [4]

Wm. C. Gray, called by defendant, testified, under objection and exception, that he was a real estate agent of twenty years' experience, acquainted with values of property along Crum creek in the vicinity of plaintiff's property, the price at which they were sometimes held, and for which they were sometimes sold; had made an examination of this property for the purpose of obtaining an idea of its value as affected and unaffected; that he knew one property on the creek which was sold, and he proposed to fix his value of plaintiff's property from that one, and the general condition of things. [5]

Chas. Roberts, a witness called by defendant, testified, under objection and exception, that he had been a manufacturer for some thirty years in the vicinity, had examined plaintiff's property with a view of forming an estimate as to its value so closely as to give the value according to his judgment; had rented steam power; knew of but one mill property along Crum creek which had been sold, the date of which he could not fix; at one time had occasion to value mill properties; knew the rental value of water power which he considered the same as steam power. His knowledge of rental value was obtained by the rental of properties on other streams. [6]

Samuel Greenwood, called by defendant, testified, under objection and exception, that he was a real estate agent of eighteen years' experience; had worked in plaintiff's mill when he was nine years old; had a knowledge of the value of lands in the vicinity; had examined mill properties on Crum creek; was about as much acquainted with their values as any real estate man; had sold mill properties with steam power, but none with water power. [7]

The court charged the jury, among other things, as follows:
If you can arrive at the value of the property as unaffected

by the exercise of the right of the state, then the next step will be to ascertain what it was worth in the market after the right had been exercised, and the difference between the two values would be the correct measure of damage. Now that is the rule. . . .

There are certain elements that the law permits you to consider; it permits you to consider all the elements that would increase or diminish the value of the plaintiff's property by the taking of this water. It is said that the stream furnished him with thirty-five horse power to run this machinery,—that is an element in the cause, but you are not confined, gentlemen, to that. If there never had been a mill there; if this water never had been used, yet he would be entitled to compensation, if it could be used for any profitable purpose, for instance, what the defendants are using the water for, the purpose of supplying water to the neighborhood, or any legitimate use the plaintiff could put that water to he is entitled to. There is no legal value in water, it is an uncertain and unreliable element. The water that flows down that stream to-day, flowed in that stream above, a day before, and it will be in the river to-morrow. There is no property in water, and the water that flows from your neighbor above then flows down upon you to the neighbor below, it is only yours while it is on your premises, and though you may use it, it is only yours so far as your present use is concerned, according to law. You have the right to use it while it is on your land, but then you must let it go down to your neighbor below. The right to water, therefore, is its value to the lands through which it flows. Mr. Lewis, therefore, had the right to use this water, while it flowed through his lands, for any legitimate purpose, that is the property he had in the water. He could use it to turn machinery or for any purpose for which he has been using it or for propelling machinery, that is one of the elements in the case.

Another element in the case is the amount of water taken. [Well, you have pretty accurate testimony that the amount of water that the defendants have taken is two million gallons a day. By the calculations presented to you upon that subject two million gallons a day at that place would develop three and one sixteenth horse power. A horse power means the force necessary to raise thirty-three thousand pounds one foot in one

minute.] [9] That is power sufficient to raise thirty-three thousand pounds one foot in one minute. It has been demonstrated that power increases according to speed in certain proportions. That is illustrated by the weight of the hand on the end of the long lever. A lever ten feet long with a bite of an inch from the fulcrum will raise one thousand pounds, but the full radius from the end of the long lever would not raise the given weight more than one sixteenth of an inch.

Old Archimedes demonstrated that he could raise the earth if you would give him the time and a foundation for the fulcrum of his lever. It would take about a million years to do it, but give him the time and good machinery and he could do it. [A horse power, therefore, means the force necessary to raise thirty-three thousand pounds one foot in one minute. It was the result of a series of experiments, made in London, by two celebrated machinists, Bolton & Watts. Now, there are three of such items of power taken from this stream, three and one sixth, and the question is, how much did that diminish the value of the land that had the right to such water. That is the question now before you. You have heard the evidence, steam power can be produced, they say, with a steam engine, properly constructed, of sufficient capacity for about $20.00 per horse power. This does not include the cost of the engine and machinery. If, therefore, you are to consider the uses to which this water could have been put, and find that steam power was necessary for its profitable use, you may consider all of these questions.] [10] You are not bound to confine yourselves to any particular use of this water, the plaintiff had the right to any legitimate use to which this water can be put. All that the law requires is your closest attention and the exercise of your best judgment, and I have no doubt that, if you will take all the testimony, consider the case calmly and thoroughly, that you will have no insuperable trouble in arriving at a fair and honest verdict. It is not for me to decide the questions of fact. They are to be decided by the jury. You have the right to consider all of these elements, the amount of water taken, the amount of force or power that that water had developed. All these elements are to be considered by you, and then, in connection with the testimony, you are to say, as well as you can, what damages Mr. Lewis has suffered by means of the taking of these

two million gallons of water. It may be, gentlemen, that it would not pay Mr. Lewis to have a steam engine there for the purpose of supplying these three horse power. You may consider that. The questions are to be decided by the value of the property before this water was taken and its value after, and the difference must be the proper damages. It may be a little difficult for you to ascertain all the proper uses to which the water could be applied, you should review the testimony. [The selling value before the injury seems to be settled at from $10,000 to $12,000, or from $9,000 to $12,000. Some of the witnesses say that a steam engine would be necessary whether this water had been taken or not; and, assuming that fact, then they calculated what three and one sixteenth additional horse power could be furnished for. Mr. Roberts, I think, is nearer correct in his statement than the other witnesses upon that point. He makes the damages $1,660.] [11] The loss is about $1,000, say some of the witnesses for the defendant. The plaintiff's witnesses take a different view of the value of the land. They think the value depends upon the water power alone, and the property is worth $12,000 without the addition of steam. That is their idea, and to reduce the power by taking these two million gallons a day, they have reduced the value one half or one third, as the case may be.

Defendant's point and answer were as follows:

1. If the jury believe that the waters of Crum creek cannot be made available for power at the plaintiff's mill site without a reconstruction of the water power plant, and that a water power plant would be of no value to him, except in connection with a steam plant, they should consider the question of damages with reference to the plant after such reconstruction, and the best measure of damages is the cost of reproducing by steam the amount of loss of power caused by the condemnation of two millions of gallons of water every twenty-four hours. *Answer :* As I have already said, if the water power is only available for propelling machinery and only valuable in connection with steam power, then this point would seem to be correct, that is to say, if the only value this water has to the plaintiff is its combined use with steam power, and only three horse power has been taken, then the correct measure of damages might be the cost of supplying the three horse power by steam. You may

therefore consider this element, and if you find the facts as. stated in this point, and find no other element of damage, and no other use to which the water taken could be profitably applied, you may find the difference in value before and after to. be the cost of producing the additional horse power to supply the power taken. Still you must confine yourselves to the value before and after the taking and the difference is the damage. But if you find the water taken was in other respects valuable to the plaintiff, then the only safe rule would be the one I have given you, that is to say, the difference in value of the whole property, before and after the taking, and as affected and unaffected by the taking of this two million gallons daily. [8]

Verdict and judgment for plaintiff for $2,900. Plaintiff appealed.

*Errors assigned* were, among others, (4–7) admission of testimony; (8) answer to defendant's first point, quoting point and answer; (9–11) portions of the charge, quoting bills of exception, evidence, point, answer and instructions.

*A. Lewis Smith,* for appellant, cited: Chambers v. South Chester, 140 Pa. 510; Michael v. Crescent Pipe Line Co., 159 Pa. 99.

*Isaac Johnson,* with him *E. H. Hall* and *W. B. Broomall,* for appellee, cited: Dawson v. Pittsburg, 159 Pa. 317; Coal Co. v.. Ingham, 36 Pa. 194.

OPINION BY MR. JUSTICE WILLIAMS, July 15, 1896 :

The fourth, fifth, sixth and seventh assignments of error relate to the action of the court in permitting certain witnesses to express an opinion upon the value of the property of the plaintiff as it was before and after the appropriation by the defendants of water from Crum creek. The defendants had seized under the right of eminent domain two millions of gallons per day of the water which was not returned again to the stream. The plaintiff used the stream to aid in propelling their machinery, and the withdrawal of two millions of gallons had the effect of reducing the value of the stream as a water power by about two and a half horse power. The question before the jury was the

extent to which this action of the water company had reduced the actual value of the plaintiff's property. The evidence offered bore directly upon that question, and we think the witnesses were properly admitted. They showed upon the examination to which they were severally subjected a sufficient knowledge of the subject to which their attention was called to qualify them to speak upon it. The value of their testimony was for the jury to determine.

The eighth assignment of error complains of the answer of the learned judge to the defendant's first point. It is contended that the answer was calculated to leave the jury under the impression that the plaintiff's damages were simply so much money as would replace with steam the two and a half horse power previously furnished by the water taken by the defendant company. We do not think the answer justifies the criticism thus made upon it. On the other hand, the learned judge instructed the jury to ascertain the difference in value of plaintiff's property, considering it first as it was before the appropriation of the water by the defendant and then considering it as it was affected by that appropriation. This is the true rule to apply. It fixes the loss of the party affected by the exercise of the right of eminent domain, and for that reason correctly measures the damages to which he is entitled. The ninth, tenth and eleventh assignments are directed to certain portions of the charge which it was alleged were harmful to the plaintiff. They contain statements, explanations and remarks that were not necessary and that it might have been in better form to omit, but we are unable to see that they could have misled the jury or been injurious to the case of the plaintiff. These assignments are not sustained. We see no other subject raised by the assignments not already referred to that requires discussion.

The judgment is therefore affirmed.